**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MYLAN PHARMACEUTICALS INC., <br><br> Plaintiff, <br><br> v. <br><br> TEVA PHARMACEUTICALS INDUSTRIES LTD, TEVA PHARMACEUTICALS USA, INC., TEVA NEUROSCIENCE, INC., and TEVA SALES & MARKETING, INC., <br><br> Defendants. | Civil Action No. 21-13087 (JXN) (JSA) |

**SPECIAL MASTER REPORT & RECOMMENDATION:  DISCOVERY DISPUTES**

Before the Special Master are myriad disputes between the parties concerning discovery requests Defendants Teva Pharmaceuticals Industries Ltd., Teva Pharmaceuticals USA, Inc., Teva Neuroscience, Inc. and Teva Sales & Marketing, Inc. (collectively, Teva) served on Plaintiff Mylan Pharmaceuticals Inc. ("Mylan").  Teva argues that Mylan's responses are insufficient.  Mylan objects to these disputed discovery requests.  Teva responds that Mylan's objections are without merit.

The disputes relate to three categories of discovery requests:  (1) contention interrogatories; (2) 30(b)(6) deposition topics; and (3) requests for admission.

1. **Contention Interrogatories**

Mylan objects to three contention interrogatories served by Teva on the grounds that they: (a) relate to legal issues; (b) are more suitable for expert testimony, and (c) are premature at this stage of the case.

Generally, contention interrogatories are permissible and will be enforced by a court when they seek factual information and are not served within sixty days of the beginning of discovery. *See Asta Funding, Inc. v. Your Wellbeing, LLC*, 2012 WL 2299391, at \*4 (D.N.J. June 14, 2012) ("Interrogatories seeking the underlying factual basis of a party's claims . . . [are] allowed"); *Textron Financial-New Jersey Inc. v. Herring Land Group, LLC*, 2011 WL 2039059, at \*10 (D.N.J. May 24, 2011) ("The purpose of discovery . . . is . . . to uncover the *factual* basis for Plaintiff's [] claim.") (emphasis added); DNJ Civ. R. 33.1(d) ("Contention interrogatories shall not be served until 60 days prior to the close of fact discovery unless otherwise permitted by the Court.").[1]

Courts are less likely to enforce contention interrogatories that seek legal theories, which are generally within the purview of expert testimony and lawyer argument. *See MSP Recovery Claims v. Sanofi-Aventis U.S. LLC*, 2022 WL 20359241, at \*17-18 (D.N.J. Feb. 8, 2022) ("given the scope of this case and complexity of the calculations involved, it is apparent that the information sought will be the subject of expert testimony."); *see also Conopco, Inc. v. Warner-Lambert Co.*, 2000 WL 342872, at \*4 (D.N.J. Jan. 26, 2000) (deferring certain contention interrogatories until document discovery had proceeded because the interrogatories sought "theories of [the] case that have not yet been developed").

Each of the three disputed interrogatories will be analyzed with these principles in mind.

Interrogatory No. 10: "Identify and state all factual and legal bases for Your contention that 'Teva's conduct resulted in at least hundreds of millions of dollars in lost sales', Compl. ¶ 23, and, to the extent You contend that You are entitled to damages, identify and describe (1) all

---

[1] The close of fact discovery in this case is December 12, 2025, and therefore the timing of these interrogatories is not premature.

2

facts and/or documents supporting this contention; (2) the precise amount of damages You are seeking; (3) the theories by which You calculate damages; and (4) the specific amount of damages You contend are attributable to each separate instance of conduct You allege."

On one hand, Interrogatory No. 10 seeks the factual basis for Mylan's contention that it has suffered substantial harm resulting from Teva's allegedly anticompetitive conduct. On the other hand, seeking the quantification of the damages that Mylan claims, and the legal bases for that theory, are not appropriate uses of this form of discovery.

Accordingly, Mylan shall state the factual basis for its contention that it has suffered significant lost sales, or other specified harms, including how those losses or other harms were caused by Teva's conduct. The answer shall specify the date range of each claimed loss or other harm for the categories of conduct permitted to proceed by the Special Master's Report & Recommendation. Specifically, Mylan shall answer for the two categories of conduct by Teva that the Special Master has ruled remain in this case (the so-called "DAW Campaign" and the alleged exclusionary agreements Teva entered into with Pharmaceutical Benefit Managers ("PBMs") and specialty pharmacies). There are other categories of conduct that Mylan alleged in its Complaint that the Special Master ruled should be dismissed from Mylan's Complaint. These allegations are the subject of Mylan's objection to the Special Master's Report & Recommendation that is pending with the Court. If additional categories of conduct alleged by Mylan are reinstated by the Court, Mylan can amend its response to encompass that additional conduct.

Mylan need not provide a response stating the quantification of specific dollar calculations of the damages amounts of each alleged loss or harm, nor legal theories. The precise dollar amount of damages claimed by Mylan, and legal theories of its damages, will be

3

the subject of expert reports and expert discovery as this case proceeds to later stages. Mylan's response must state the factual basis for its assertion of loss or other harm caused by Teva's conduct, including the dates when such facts occurred that caused the harms alleged.

Interrogatory No. 11: "Identify and state all factual and legal bases for Your contention that '[o]n top of monetary damages, Mylan has suffered and continues to suffer harm to its reputation and goodwill with medical professionals and MS patients throughout the country, as a result of Teva's false and misleading statements that Mylan has produced an inferior product and offers inferior support to MS patients', Compl. ¶ 23."

The subjects of loss of goodwill and reputational harm are factual issues that are within the purview of fact discovery. Mylan shall state the factual bases supporting its contentions responsive to Interrogatory No. 11. Mylan need not state its legal theories concerning the subject of this Request.

Interrogatory No. 12: "Identify and state all factual and legal bases for Your contention that the relevant market for Copaxone is limited to only brand Copaxone and A-rated generic versions of Copaxone, Compl. ¶¶ 204-5, including by identifying the basis for Your contention that alternative therapies for MS, including but not limited to Aubagio, Avonex, Betaseron, Gilenya, Lemtrada, Ocrevus, Plegridy, Rebif, Tysabri, and Zinbryta, are not within the relevant market for Copaxone."

The relevant market is primarily a question of law and will surely be the subject of competing expert reports on both sides of this case. This is not an appropriate subject matter of a contention interrogatory.

**2. 30(b)(6) Deposition Topics**

Mylan objects to two 30(b)(6) corporate deposition topics sought by Teva.

Topic No. 22: "Any actions You took advocating for legal, regulatory, or policy changes that could impact Your GA products and the sale of and/or competition for GA products in any way, including but not limited to submissions You made, meetings you attended, or other actions You look with respect to federal agencies and/or representatives of the United States Congress in 2018 or otherwise concerning, among other things: (a) formulary placement; (b) rebates and (c) Medicare part D coverage."

This topic relates to Mylan's alleged lobbying efforts. As drafted it is quite broad. For example, lobbying efforts for "legal, regulatory, or policy changes that could impact" sales or competition encompasses a broad swath of potential information. Later in the same Topic, the request specifies lobbying efforts made to federal agencies concerning specific topics during the time period in which Mylan had received FDA approval for GA. The topics of formulary placement and rebates are directly relevant to the issues in this case.

Accordingly, a Mylan witness should be prepared to testify to efforts by Mylan to lobby federal agencies, and/or members of Congress, concerning formulary placement and rebates between 2018 and present day.

Topic No. 23: "The factual basis for any damages You claim in this action."

This Topic is similar to Interrogatory No. 10 above concerning the bases for Mylan's claimed damages. For the same reasons stated above, a Mylan witness shall be prepared to testify about the factual bases for Mylan's claimed harm, including claimed losses, that Mylan alleges resulted from Teva's "DAW Campaign" and exclusionary agreements.[2] Mylan's witness shall be prepared to testify about the date ranges of each claimed loss or harm. Mylan's witness

---

[2] As stated above in the context of Interrogatory No. 10, if additional categories of conduct alleged by Mylan are reinstated by the Court, the Special Master will consider whether additional 30(b)(6) testimony is warranted for the additional categories of conduct as to Topic No. 23.

need not be prepared to testify about specific damages calculations, dollar amounts, or legal theories related thereto.

### 3. **Requests for Admission**

Requests for admission are meant to "narrow the issues for trial to those which are genuinely contested." *In re Certain Consol. Zoledronic Acid Cases*, 2015 WL 12844402, at *1 (D.N.J. Mar. 16, 2015) (quoting *United Coal Companies v. Powell Const. Co.*, 839 F.2d 958, 967 (3d Cir. 1988)).  Requests for admission should generally cover a single discrete fact and be straightforward to answer.  *See United Coal Co. v. Powell Const.* Co., 839 F.2d 958, 968 (3d Cir. 1988) ("Rule 36 should not be used unless the statement of fact sought to be admitted is phrased so that it can be admitted or denied without explanation") (internal citations omitted).

Requests for admission are not to be used for legal issues or for disputed issues that constitute the "ultimate issue" in dispute in the case.  *See Zen Invs., LLC v. Unbreakable Co.*, 2008 WL 4489803, at *1 (E.D. Pa. Oct. 7, 2008) ("Requests for admission are properly objectionable when they call for a conclusion of one of the ultimate issues in the case.").

The myriad disputed requests for admission will be analyzed according to these principles.

Requests for Admission Nos. 1 through 4:  These Requests for Admission all relate to Mylan's GA approval by the FDA and Teva's citizens petitions related thereto.

The category of conduct alleged by Mylan as part of its antitrust claim pertaining to Teva's citizens petitions in response to Mylan's GA ANDA was recommended to be dismissed by the Special Master.  Mylan's objection to that recommendation is currently pending with the District Court.  Requests for Admission Nos. 1 through 4 are deferred until that objection is resolved and it is determined whether that category of alleged conduct remains in the case.  It is

6

recommended that, if the Report & Recommendation is reversed in whole or in part by the District Court, the discovery period be reopened to permit this discovery issue to be decided by the Special Master.

Request for Admission No. 5:  "Admit that Mylan had not manufactured quantities of Generic GA sufficient to supply the market as of April 16, 2015."

This topic relates to the time period prior to Mylan's FDA approval to sell GA and the question of whether, had Mylan received that approval earlier, it could have supplied the market with its generic alternative to Copaxone.  The only category of conduct alleged by Mylan against Teva that relates to the pre-FDA-approval time period is the citizens petitioning conduct, which the Special Master recommended for dismissal from Mylan's Sherman Act claim.  As stated, Mylan's objection to that recommendation is pending with the District Court.

Accordingly, Requestion for Admission No. 5 is deferred until that objection is resolved and it is determined whether the petitioning conduct remains in the case.

If Mylan contends that any other conduct by Teva affected Mylan's FDA approval date, it shall answer this RFA.

Requests for Admission Nos. 8 and 9:  These Requests seek an admission as to whether Mylan markets its "Generic GA to patients and HCPs as qualitatively better than Copaxone or other companies' GA products."

Mylan responded as follows:  "Mylan admits that it markets its Generic GA products as therapeutically equivalent to Copaxone."

If Mylan ever marketed its generic GA as qualitatively superior to Copaxone or other companies' GA products as to any aspect of the drug or customer service provided by Mylan

beyond solely the fact of its therapeutic equivalence, it shall supplement its answers to Requests for Admission Nos. 8 and 9.

Requests for Admission Nos. 10 and 11:  These Requests seek an admission as to whether Mylan's marketing of its "Generic GA to patients and HCPs makes qualitative assessments or comparisons of Mylan's Generic GA with respect to Copaxone or other companies' GA products."

Requests for Admission Nos. 10 and 11 are duplicative, compound and not appropriately confined to be suitable for the request for admission discovery device.

Requests for Admission Nos. 12 through 15:  These Requests relate to statements in Mylan's marketing of GA about the "side effect profile" of Mylan's GA product "compared to Copaxone or other Companies' GA products."

Mylan responded to each Request by stating that "Mylan admits that it markets its Generic GA products as therapeutically equivalent to Copaxone.  Mylan otherwise denies."

Mylan shall respond to Requests for Admission Nos. 12 through 15 by identifying by Bates number all marketing-related documents produced in discovery that compare the "side effect" profile of Mylan's GA with Copaxone and/or other GA products.  And Mylan shall further state whether its representatives orally compared the side effects of Mylan's GA product with Copaxone or any other GA product during its marketing.

Requests for Admission No. 16 and 17:  These Requests seek admissions as to whether Mylan's GA either is, or is not, "qualitatively better than Copaxone or other companies' GA products."

Mylan responded to these Requests as follows:  "Mylan admits that Mylan's Generic GA products are therapeutically equivalent to Copaxone.  Mylan otherwise denies."

Mylan shall supplement its answers to Requests for Admission Nos. 16 and 17 to admit or deny whether Mylan's generic GA is qualitatively superior to Copaxone or other companies' GA products as to any aspect of the drug or customer service provided by Mylan beyond solely the fact of its therapeutic equivalence.

Requests for Admission Nos. 20 and 21:  These Requests relate to whether "DAW" "messaging" or "instructions" were included in Mylan's marketing and patient enrollment forms.

Mylan responded to these Requests as follows:  "Mylan admits that its Patient Enrollment Form, under the "Prescriber Signature Required for Prescription Orders" section, has two signature lines available for Prescriber's Signature: (1) Dispense as Written, or (2) Brand Exchange Permissible.  Mylan otherwise denies."

Mylan's response sufficiently responds to the Requests for Admission.  Mylan has stated what "DAW" information is included in the relevant materials and otherwise denied the Requests for Admission.

Request for Admission No. 28:  "Admit that Mylan's Generic GA competes with Copaxone on price."

This Request seeks an admission about an ultimate issue in this case that is in dispute and is not suitable to the request for admission discovery device.

Request for Admission No. 29:  "Admit that Mylan competes with Copaxone and other companies' GA products by offering rebates on its Generic GA to PBMs in exchange for formulary access or preferred formulary placement."

Mylan responded to this Request first by stating its theory of the case regarding Teva's multi-pronged strategy to thwart Mylan's ability to compete.  Mylan further responded to this Request as follows:  "Mylan admits that its Generic GA competes with Copaxone on several

aspects that vary depending on the customer, including, but not limited to, accessibility, patient support programs, patient assistance programs, nursing support, co-pay support, pharmacy access, product availability, and stability of supply.  Other than as expressly admitted, Mylan denies Request for Admission No. 29."

While the question of whether Mylan "competes" with Teva by virtue of certain conduct has legal implications, the underlying factual premises of this Request—Mylan's rebates—is relevant, discoverable and answerable.  Mylan shall restate its response to this Request omitting the non-responsive portions that relate to Teva's alleged actions.  Mylan shall further respond to Request for Admission No. 29 by admitting or denying whether Mylan offers rebates on its Generic GA to PBMs in exchange for formulary access or preferred formulary placement.

Request for Admission No. 30:  "Admit that Mylan enters agreements with PBMs that place[] Mylan's Generic GA on formularies alongside Copaxone."

Mylan responded to this Request first by stating its theory of the case regarding Teva's multi-pronged strategy to thwart Mylan's ability to compete, and then admitting:  "Mylan admits that it enters agreements with PBMs that place Mylan's Generic GA on formularies."

Mylan shall restate its response to this Request omitting the non-responsive portions that relate to Teva's alleged actions.  Mylan's response shall address the phrase in the Request, "alongside Copaxone," admitting or denying whether Mylan "enters agreements with PBMs that place[] Mylan's Generic GA on" the same formularies as Copaxone.  In addition to admitting or denying this Request, Mylan may provide any explanation or clarification that is needed for clarity, so long as it is responsive to the Request, and is not evasive.

Request for Admission No. 31: "Admit that in response to rebates offered by companies that market products that compete with Mylan's Generic GA, Mylan competes by either offering comparable or larger rebates or lowering prices."

Mylan responded to this Request with the above-referenced case theory about Teva's "multi-pronged strategy."  Mylan then stated:  "Mylan admits that its Generic GA competes with Copaxone on several aspects that vary depending on the customer, including, but not limited to, accessibility, patient support programs, patient assistance programs, nursing support, co-pay support, pharmacy access, product availability, and stability of supply.  Other than as expressly admitted, Mylan lacks sufficient knowledge and/or information and is unable to admit or deny this Request."

This response is not responsive to this Request.  However, the Request, as drafted, is not as articulate as it should be, and encompasses the concept of "competition," which, as stated, has legal implications in a Sherman Act claim; however, the request also has proper requests to admit that should be answered.  Therefore, the Special Master will order that portions of this Request be answered, while other portions need not be answered, as follows:

Mylan shall respond to Request for Admission No. 31 by admitting or denying whether, when another seller of GA offers rebates, Mylan has ever responded by offering a rebate or lowering its prices for GA.  In addition to admitting or denying this Request, Mylan may provide any explanation or clarification that is needed for clarity, so long as it is responsive to the Request, and is not evasive.

Request for Admission No. 32: "Admit that the decision to place a drug on a formulary is ultimately made by PBMs."

11

Mylan responded to this Request as follows: "Mylan admits that some managed care organizations contract with a PBM, which may, in certain circumstances, develop a formulary. Mylan otherwise lacks sufficient knowledge and/or information and is unable to admit or deny this Request."

Mylan's Response sufficiently responds to Request for Admission No. 32.

Request for Admission No. 33: "Admit that Mylan entered agreements with PBMs that offered rebates or lower prices in exchange for preferred formulary positions for Generic GA."

Mylan responded to this Request as follows: "Mylan admits Teva's agreements with specialty pharmacies prevented the distribution of Mylan's Generic GA regardless of the formulary position of Mylan's Generic GA. Mylan further admits it entered agreements with PBMs that resulted in preferred formulary positions for Mylan's Generic GA. Mylan otherwise lacks sufficient knowledge and/or information and is unable to admit or deny this Request."

Mylan's response is not fully responsive to the Request because it does not address the core premise: whether the rebates/reduced prices provided for in Mylan's agreements with PBMs were offered "in exchange for" preferred formulary positions. Mylan admits that the agreements "resulted in" preferred formulary pricing but otherwise disclaims knowledge as to this question. However, this information is within Mylan's knowledge, and it should answer Request for Admission No. 33 directly as an admission or denial, followed by needed explanation or clarification as Mylan deems necessary for clarity, so long as it is responsive to the Request, and is not evasive.

Request for Admission No. 34: "Admit that the FDA investigated adverse events associated with the auto-injector used in Mylan's Generic GA."

Mylan responded to this Request as follows: "Mylan lacks sufficient knowledge and/or information and is unable to admit or deny this Request.  On that basis, Mylan denies."

It is not plausible that Mylan lacks any knowledge as to an FDA investigation into adverse events caused by a product of Mylan.  Mylan shall respond to this Request based on its own knowledge of the FDA's investigation, including based on its communications with the FDA.

Requests for Admission Nos. 35 and 36:  These Requests relate to whether Mylan GA's "market penetration" was adversely impacted or slowed due to the "FDA's investigation" of the "auto-injector used in Mylan's Generic GA."

Mylan responded to these Requests as follows:  "Mylan admits that Teva thwarted Mylan GA's ability to compete with Copaxone by engaging in a multi-pronged strategy that included, but was not limited to, restrictive agreements with PBMs, payors, and specialty pharmacies, spreading falsehoods and misrepresentations regarding Generic GA, and creating a Dispense-as-Written campaign that capitalized on these falsehoods and misrepresentations.  Mylan otherwise lacks sufficient knowledge and/or information and is unable to admit or deny this Request."

Mylan's response is evasive and avoids answering the subject matter of the Requests.  Mylan shall respond to Requests for Admission Nos. 35 and 36 to the best of its ability, based on the information known to Mylan about the dates of any such FDA investigation into the auto-injector used by Mylan's generic GA, and the extent to which its market penetration of generic GA was affected by such an FDA investigation.


/s/ *Faith S. Hochberg*                                                            December 8, 2025
Faith S. Hochberg, U.S.D.J. (Ret.)                                      Date
Special Master

13