**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

Chambers of
**Jessica S. Allen**
United States Magistrate Judge

Martin Luther King, Jr. Federal Bldg.
& U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102
(973) 645-2580

October 6, 2026

**FILED UNDER TEMPORARY SEAL**

**LETTER ORDER**

**TO: ALL COUNSEL OF RECORD BY ECF**

**Re: Mylan Pharmaceuticals, Inc. v.**
**Teva Pharmaceuticals USA, Inc., et al.**
**Civil Action No. 21-13087 (JXN) (JSA)**

Dear Counsel:

Before the Court is Plaintiff's[1] objection, pursuant to Federal Rule of Civil Procedure 53(f), to the Report and Recommendation of Special Master Hon. Faith S. Hochberg (Ret.) dated March 18, 2026 (ECF No. 239) (the "R&R"). (ECF Nos. 245 & 249). Defendants[2] oppose Plaintiff's objection. (ECF No. 248). No oral argument was heard. *See* Fed. R. Civ. P. 78. For the reasons set forth below, and for good cause shown, Plaintiff's objection is **OVERRULED**, and the R&R is **ADOPTED** as the Opinion of this Court.

## I. RELEVANT BACKGROUND[3]

This is a complex antitrust case. Teva developed and currently sells Copaxone®, which is an injectable treatment for multiple sclerosis that utilizes the active ingredient glatiramer acetate, which the parties refer to as "GA." (Compl., ¶¶ 68, 73, ECF No. 1). Mylan is the manufacturer of a generic form of GA, which has been sold since 2017. (*Id.*) Mylan alleges that Teva engaged

[1] Mylan Pharmaceuticals, Inc. ("Plaintiff" or "Mylan").

[2] Teva Pharmaceuticals Industries, Ltd.; Teva Pharmaceuticals USA, Inc.; Teva Neuroscience; and Teva Sales & Marketing, Inc. (collectively, "Defendants" or "Teva").

[3] This case, which the parties refer to as the "Mylan Action," has been coordinated for discovery purposes with *In re: Copaxone Antitrust Litig*., 22-1232 (JXN) (JSA) (the "In re Copaxone Matter"). (*See* ECF No. 104). The R&R, however, relates only to the Mylan Action. The facts and procedural history of the Mylan Action are well-known to the parties and have been set forth in prior reports and recommendations and orders. (*See* ECF Nos. 159 & 244). The Court recites only the facts and procedural history relevant to addressing the instant dispute.

in an anticompetitive scheme to delay U.S. Food and Drug Administration ("FDA") approval of Mylan's GA product and to prevent Mylan's GA product from gaining significant market share, despite being lower priced. (*Id.*, ¶ 3). As part of this alleged anticompetitive scheme, Mylan contends that Teva engaged in several types of anticompetitive behavior, including Teva having filed sham litigation against the FDA. (*Id.*, ¶ 183).

On August 21, 2023, the Honorable Julien X. Neals, U.S.D.J. appointed Judge Hochberg as a Special Master (herein, "the Special Master" or "Judge Hochberg") to assist with the discovery and pretrial process. (ECF No. 128, "Order Appointing Special Master").

## II. THE CURRENT DISPUTE

On December 2, 2025, Mylan submitted a letter-brief requesting that the Special Master undertake an *in camera* review of thirty-six documents on Teva's privilege log, claiming that those documents were within the scope of the crime-fraud exception to the attorney-client privilege. (*See* ECF No. 209-1, at 1). Specifically, Mylan argued that Teva filed a sham lawsuit in 2020 against the FDA seeking to have Copaxone reclassified as a "biologic" rather than a "protein" (the "Reclassification Lawsuit"). (*See id.*). According to Mylan, communications with counsel in connection with this purported sham litigation should not be protected by the attorney-client privilege but rather fall within the crime-fraud exception to the privilege. (*See id.*, at 4).

In its opposition papers, Teva argued that sham litigation cannot be properly considered a crime or fraud for the purposes of applying the crime-fraud exception. (*See* ECF No. 209-13, at 1-2). Teva continued that even assuming a purported sham litigation constitutes a "fraud," Mylan lacked a sufficient factual basis to justify an *in camera* review. (*See id.*, at 3). In reply, Mylan reiterated its prior arguments in further support of its discovery application. (*See* ECF No. 209-24).

Following oral argument on Mylan's application, Judge Hochberg denied Mylan's requests for an *in camera* review of the thirty-six (36) privileged documents. (*See id.*, at 16). The Special Master reasoned that Mylan did not provide a sufficient basis to justify an *in camera* review. (*See id.*, at 12).

In response, Mylan filed an objection, advancing two main arguments. (ECF No. 245, at 1). First, the Special Master applied the incorrect standard in determining whether to conduct an *in camera* review. Second, because of her misapplication, the Special Master improperly found that Mylan did not meet its burden for justifying an *in camera* review. (*Id.* at 4-7). In opposition, Teva primarily contends that the Special Master correctly applied the adequate factual basis standard and concluded that Mylan's evidence was insufficient to warrant an *in camera* review of its privileged documents. (*See* ECF No. 248, at 1). Teva further contests Mylan's position that a sham litigation can constitute a fraud for purposes of the crime-fraud exception.

## III. STANDARD OF REVIEW

The Order Appointing Special Master provides: "The parties have agreed that a ruling on a fact discovery dispute by the Special Master shall be filed, reviewed, and ruled upon by the

Magistrate Judge, and shall constitute a decision of the Court for the purposes of an appeal to the United States Court of Appeals." (Order Appointing Special Master, ¶ 4).

This Court's review of the R&R is governed by Federal Rule of Civil Procedure 53, which states in relevant part:

> (f) Action on the Master's Order, Report, or Recommendations.
> . . .
> (4) Reviewing Legal Conclusions. The court must decide de novo all objections to conclusions of law made or recommended by a master.
> (5) Reviewing Procedural Matters. Unless the appointing order establishes a different standard of review, the court may set aside a master's ruling on a procedural matter only for an abuse of discretion.

Fed. R. Civ. P. 53(f)(4)-(5).

The parties do not appear to dispute that *de novo* review is the appropriate standard. (*See* ECF No. 245, at 3; ECF No. 248, at 9). This Court agrees. *De novo* review is "an independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *In re Allergan Biocell Textured Breast Implant Prods. Liab. Litig.*, 2022 U.S. Dist. LEXIS 141982, at *2 (D.N.J. Aug. 9, 2022) (citations omitted). *De novo* review is appropriate here because the dispute, concerning the propriety of an *in camera* review, involves both questions of fact and law. *See, e.g., Callwave Commc'ns LLC v. AT&T Mobility LLC*, 2016 WL 3450736, at *1 (D. Del. June 16, 2016) (applying *de novo* standard of review when reviewing Special Master's determination of the applicability of the attorney-client privilege); *In re Lincoln Nat'l COI Litig.*, 2019 WL 3940912, at *2 (E.D. Pa. Aug. 21, 2019) (applying *de novo* standard of review to Special Master's determination that documents were not protected by the attorney-client privilege).

## IV. DECISION

The Court preliminarily notes that the attorney-client privilege, while important, is not without limits. *See United States v. Zolin*, 491 U.S. 554, 562 (1987). The crime-fraud exception to the attorney-client privilege serves as one limit and exists "to assure that the 'seal of secrecy,' between lawyer and client does not extend to communications 'made for the purpose of getting advice for the commission of a fraud' or crime." *Id.*, at 563 (internal citations omitted). The Third Circuit Court of Appeals has held that "[t]o circumvent these privileges under the crime-fraud exception, the party seeking to overcome the privilege—in this case, the Government— 'must make a prima facie showing that (1) the client was committing or intending to commit a fraud or crime, and (2) the attorney-client communications were in furtherance of that alleged crime or fraud.'" *In re Grand Jury*, 705 F.3d 133, 151 (3d Cir. 2012) (quoting *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000)).

To determine whether the party challenging the claim of privilege has met its burden, courts, in their discretion, may undertake an *in camera* review of the disputed privileged documents. *See Zolin*, 491 U.S. at 571–572. In *Zolin*, however, the Supreme Court held that prior to conducting the *in camera* review, courts must find "a showing of a factual basis adequate to

support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.*, at 572. "[T]he decision to engage in *in camera* review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal." *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 96 (3d Cir. 1992) (internal quotations omitted); *But see In re ML-Lee Acquisition Fund II, L.P. & ML-Lee Acquisition Fund (Ret. Accts.) II, L.P. Sec. Litig.*, 848 F. Supp. 527, 566 (D. Del. 1994) ("mere allegations are not sufficient [to justify an *in camera review*]").

Here, while the parties dispute whether the Reclassification Lawsuit was a sham litigation, and if so, whether a sham litigation can constitute a fraud within the meaning of the crime-fraud exception, the Court need not reach this issue. Even assuming Mylan is correct that a sham litigation can constitute a fraud, the Court finds, consistent with *Zolin*, that Mylan has not shown a factual basis sufficient to support a reasonable good faith belief that an *in camera* review of the disputed documents may reveal evidence to establish application of the crime-fraud exception. *See Zolin*, 491 U.S. at 572.

Mylan relies on the Reclassification Lawsuit itself, as well as four categories of evidence that it contends create a sufficient factual basis to warrant an *in camera* review: (1) a Teva Board presentation titled "Generic COPAXONE 40mg Update" from October 2017 referencing "legal pathways" as one of its "key activities to defend against generic erosion"; (2) deposition testimony of Teva USA's former President and CEO Brendan O'Grady, who Mylan claims "confirmed that using these "legal pathways" was one prong of Teva's generic defense strategy"; (3) a December 2017 Teva Board Deck, which identifies several other lawsuits that Teva filed after Mylan entered the market, including a non-Hatch-Waxman patent lawsuit that Teva dismissed after it did not prevail on claim construction; and (4) Teva's general litigation history with respect to Copaxone, which Mylan considers abusive. (*See* ECF No. 245 at 7).

The Court first considers the Reclassification Lawsuit. There, the court granted summary judgment for the FDA, and in so doing, opined that "Teva has pursued every available avenue to prevent other glatiramer acetate products from coming to market," and that the suit was, as that court saw it, part of "concerted resistance by Teva" in order "to stifle competition." 514 F. Supp. 3d 66, 74 & 81 (D.D.C. 2020). The court, however, did *not* find that Teva's actions in filing the lawsuit itself were baseless or in any way a sham. Rather, the court granted summary judgment in FDA's favor, and in doing so criticized Teva's alleged motives for bringing suit. Such criticisms, however, do not amount to evidence of a fraud or a crime. Accordingly, the court's summary judgment decision does not convert the filing of the Reclassification Lawsuit into evidence of a crime or fraud sufficient to warrant an *in camera* review. Thus, Mylan's reliance on the Reclassification Lawsuit is not persuasive.

Mylan's reliance on *King Drug Co. of Florence, Inc. v. Abbott Lab'ys*, 2023 WL 2646926 (E.D. Pa. Mar. 27, 2023), mandamus denied *In re Abbott Labs.*, 96 F.4th 371 (3d Cir. 2024), is similarly unconvincing. In *King Drug*, the plaintiffs contended that they were harmed by defendants' prior sham litigation against generic company Perrigo and successfully sought an *in camera* review of documents relating to the prior litigation on the theory that they were potentially within the crime-fraud exception to the attorney-client privilege. *Id.* at *5. In finding that the

plaintiffs had provided a sufficient factual basis to conduct the *in camera* review, the district court credited *multiple* courts that "ha[d] determined by a preponderance of the evidence that the attorneys who brought the Perrigo lawsuit were experienced patent attorneys who knew the patent they were attempting to enforce was invalid," and that the Perrigo lawsuit was not only objectively baseless but also was filed "to impose expense and delay on ... Perrigo so as to block [its] entry into the TTRT market" and impede the launch of the generic product. *Id*., at *6 (internal quotes and cites omitted).

Here, unlike in *King Drug*, Mylan had already launched generic Copaxone before Teva filed the Reclassification Lawsuit. (*See* R&R at 14). Additionally, as previously noted herein, the court in the Reclassification Lawsuit did not find that Teva's counsel knew that the filing of the suit or actions taken in connection therewith were baseless. *Compare Teva*, 514 F. Supp. 3d at 74–81 (tracing Teva's efforts to limit generic Copaxone without concluding that Teva's lawyers knew that their actions were meritless), *with King Drug*, 2023 WL 2646926 at *6 ("attorneys who brought the Perrigo lawsuit were experienced patent attorneys who knew the patent they were attempting to enforce was invalid.").

Putting aside the Reclassification Lawsuit, Mylan's other categories of proffered evidence fall short of the threshold required to justify an *in camera* review. The evidence amounts to speculation and conclusory assertions rather than objective evidence.

First, the Teva Board presentation relating to "legal pathways" amounts to an inference that Teva considered "legal pathways" as a tool to make more money. Yet, Mylan offers no evidence that the vague term legal pathways is proof of illegal conduct. For example, Mylan's Exhibit G, a Teva Board presentation titled "Generic COPAXONE 40mg Update" from October 2017, references "legal pathways" as one its "key activities to defend against generic erosion." (ECF No. 245-3, at 3). "Legal pathways," however, can refer to a multitude of conduct permitted by law. Additionally, Exhibit G was created almost three years *before* the alleged sham litigation was filed and makes no mention of the Reclassification Lawsuit. (See id., at 1).

Second, Mylan relies on an excerpt from Teva USA's former President and & CEO Brendan O'Grady's deposition where the following exchange took place:

Q: And we've also seen on that "Key activities to defend Copaxone" slide that legal pathways was another prong of Teva's strategy right?

A: It appears, by what you've shown me.

(ECF No. 245-4, O'Grady Tr. 227:23-228:4).

As Teva observes, nowhere in the cited testimony is there any mention of the Reclassification Lawsuit. (ECF No. 248, at 12). Consequently, such testimony does not suggest that "legal pathways" is referring to anything other than lawful activity.

Third, Mylan relies on three other cases that Teva previously filed relating to Copaxone, as referenced in Exhibit I. (ECF No. 245-5, at 9; ECF No. 248, at 12). Exhibit I also is from

December 2017 – years before the Reclassification Lawsuit was filed in 2020. (*See* ECF No. 245-5, at 1). This 2017 case does not establish a basis for an *in camera* review. To that end, the court's decision in *In re Neurontin Antitrust Litigation*, 801 F. Supp. 2d 304 (D.N.J. 2011) is instructive. There, the plaintiffs sought an *in camera* review of documents between Warner-Lambert and its counsel relating to prior patent litigation against generic manufacturers, arguing that Warner-Lambert filed the patent litigation to further its illegal off-label promotion scheme. *Id.* The court rejected plaintiffs' request for an *in camera* review because plaintiffs provided no evidence that a relationship existed between the prior and current litigation besides its allegation that "both efforts may have been made in order to wring further profit out of [the drug]…." *Id*., at 310-11.

Finally, Mylan references "Teva's past conduct and serial abuse of legal process." (ECF No. 245, at 7). While Mylan contends that these are relevant "to the question of whether Teva's Reclassification Lawsuit was an abuse of legal process," (*id.)*, this argument, on its face, is based on mere allegations without any concrete evidence. Additionally, as already stated, no court has found that the Reclassification Lawsuit was a crime or fraud.

## V. CONCLUSION

For the reasons stated above, this Court finds that the R&R correctly concluded that Mylan did not provide an adequate factual basis to warrant an *in camara* review of Teva's privileged documents. Accordingly, Mylan's objection to the R&R, (ECF Nos. 245 & 249), is **OVERRULED**, and the Special Master's R&R dated March 18, 2026, (ECF No. 239), is **ADOPTED** as the Opinion of this Court.

A presumption exists that "the public has a right of access to judicial materials," *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019). Accordingly, it is **ORDERED** that, to the extent the parties contend that sealing is appropriate, pursuant to Local Civil Rule 5.3(c), they shall jointly submit a proposed redacted version of this Letter Order for public filing within fourteen (14) days.

**SO ORDERED**.

**s/Jessica S. Allen**
**Hon. Jessica S. Allen**
**United States Magistrate Judge**

cc: Hon. Julien X. Neals, U.S.D.J.